UNITED STATES COURT FOR FEDERAL CLAIMS

| | | |
|---|---|---|
| MARK S. ZAID, P.C. *et al.* | * | |
| | * | |
| Plaintiffs | * | No. 08-20 C |
| | * | Judge Thomas C. Wheeler |
| v. | * | |
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | |
| Defendant | * | |
| | * | |

* * * * * * * * * * * * *

**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, by and through his undersigned counsel, hereby respectfully submits this Cross-Motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for Summary Judgment.

A Memorandum of Law and a proposed Order accompanies this Motion.

Date: July 21, 2008

Respectfully submitted,

s/ Eric H. Imperial

Eric H. Imperial (D.C. Bar #427139)
815 Connecticut Avenue, N.W.; Ste. 220
Washington, DC 20006
(202) 457-1280
(202) 595-1986 (fax)
eric@imperiallaw.com

Attorney for Plaintiffs

UNITED STATES COURT FOR FEDERAL CLAIMS

| | | |
|---|---|---|
| MARK S. ZAID, P.C. *et al.* | * | |
| | * | |
| Plaintiffs | * | No. 08-20 C |
| | * | Judge Thomas C. Wheeler |
| v. | * | |
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | |
| Defendant | * | |
| | * | |

* * * * * * * * * * * * *

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

FACTUAL BACKGROUND .......... 4

ARGUMENT .......... 9

I. LEGAL STANDARDS .......... 9

A. Subject Matter Jurisdiction. .......... 9

B. Motion to Dismiss Pursuant to RCFC 12(b)(6). .......... 10

C. Summary Judgment .......... 11

II. MR. ZAID'S CONTINENGY FEE AGREEMENT WITH THE MAKUCHES CONSTITUTES A PROPERTY RIGHT THAT GRANTS THIS COURT JURISDICTION TO ADJUDICATE THE GOVERNMENT'S TAKING WITHOUT PAYMENT OF REASONABLE COMPENSATION. .......... 12

III. CONGRESS' REDUCTION OF MR. ZAID'S CONTINGENCY FEE CONSTITUTED A CONSTITUTIONAL TAKING FOR WHICH HE IS ENTITLED TO REASONABLE COMPENSATION .......... 19

A. The Private Relief Bills Enacted By Congress Were Directed at Modifying Mr. Zaid's Legal Contract With the Makuches .......... 19

B. The Ten Percent Payment Limitation Provision Imposed Upon Mr. Zaid The Entire Burden Of The Government's Desire To Maximize The Amount Received By The Makuches Thereby Entitling Him Under The Fifth Amendment To Receive Appropriate Compensation .......... 22

CONCLUSION .......... 28

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 11, 12
*Armstrong v. United States*, 364 U.S. 40, 49 (1960) .......... 22
*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .......... 10
*Bernard v. Las Americas Communs.*, 84 F.3d 103, 109 (2nd Cir. 1996) .......... 12
*Boettjer v. Chesapeake & O.R. Co.*, 612 F. Supp. 1207, 1210 (Regional Rail Reorg. Ct. 1985) .......... 15
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986) .......... 11
*Chang v. United States*, 859 F2d. 893 (Fed. Cir. 1988) .......... 15, 27
*Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934 (Fed. Cir. 2007) .......... 10
*Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211 (1986) .......... 8
*Continental Casualty Co. v. Cole*, 809 F.2d 891, 897 (D.C. Cir. 1987) .......... 12
*Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995) .......... 13
*George Hyman Constr. Co. v. United States*, 30 Fed. Cl. 170, 173 (1993) .......... 11
*Huntleigh USA Corp. v. U.S.*, 525 F.3d 1370, 1377 - 78 (Fed. Cir. 2008) .......... 14, 20
*Long Island Sav. Bank v. United States*, 503 F.3d 1234, 1243-44 (Fed. Cir. 2007) .......... 11
*Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545 (Fed. Cir. 1994) .......... 9, 24, 26, 27
*Lynch v. United States*, 292 U.S. 571, 579 (1934) .......... 13
*Norman v. Baltimore & Ohio R. Co.*, 294 U.S. 240, 307 – 308 (1935) .......... 15
*Omnia Commercial Co. v. United States*, 261 U.S. 502, 511 (1923) .......... 19, 21
*Palmyra Pac. Seafoods, L.L.C. v. United States*, 80 Fed. Cl. 228, (Fed. Cl. 2008) .......... 21
*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, (1978) .......... 22, 23, 24, 27
*Riley & Ephriam Constr. Co., Inc. v. United States*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) .......... 11
*Rockefeller Ctr. Props. v. United States*, 32 Fed. Cl. 586, 592 (Fed. Cl. 1995) .......... 15
*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) .......... 8
*Scheuer v. Rhodes*, 416 U.S974) .......... 10
*Scientific Components Corp. v. ISIS Surface Mounting, Inc.*, 539 F. Supp. 2d 653, 658 (E.D.N.Y. 2008) .......... 13
*Simon v. Circle Assocs.*, 753 A.2d 1006, 1012 (D.C. 2000) .......... 12
*Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 95 (2nd Cir. 2007) .......... 12
*United Pac. Ins. Co. v. United States*, 464 F.3d 132d. Cir. 2006) .......... 11
*United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n. 16 (1977) .......... 14
*United States v. Causby*, 328 U.S. 256 (1946) .......... 22
*United States v. Petty Motor Co.*, 327 U.S. 372, 381 (1946) .......... 14
*Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, Fed. Cir. 2002) .......... 11

## STATUTES

28 U.S.C. § 1491 .......... 9

## RULES

Rules of Court of Federal Claims 56(c) .......... 10

Plaintiffs Mark Zaid, Esq. and Mark Zaid, P.C. ("Mr. Zaid") file this combined opposition to the defendant United States Government's Motion to Dismiss under Rule 12(b)(6) and Cross-Motion for Summary Judgment pursuant to Rule 56. The Government's Motion should be denied, and Mr. Zaid's Motion should be granted as he has alleged, and proven, the existence of a legal property interest (a contract for legal services) and a compensable taking by the Government (Congress' modification of the payment terms of that contract) of $466,666.00.

Although Mr. Zaid could not be paid for his legal work unless the $2,000,000.00 in private relief legislation was enacted into law, once that money was appropriated by the Government Mr. Zaid was entitled to collect his 33 1/3% contingency fee as per the terms of the contractual agreement. The contingent nature of the financial arrangement is distinct from, and unrelated to, the discretion that Congress had when considering the private relief bills. Congress' action was directed specifically at both Mr. Zaid and his clients. By enacting the private relief legislation with a 10% payment limitation provision that expressly modified the terms of the engagement contract between Mr. Zaid and his clients (indeed, Congress made it a crime for his clients to pay, or Mr. Zaid to receive, more than 10%), Congress took money from Mr. Zaid that his clients had agreed to pay and delivered that money instead to his clients. That action constitutes a compensable taking under the Fifth Amendment, and Mr. Zaid is legally entitled to payment of $466,000.00 plus pre-judgment interest.

## **FACTUAL BACKGROUND**

Beginning in the late 1960s/early 1970s, Barbara and Eugene Makuch began providing assistance to the Federal Bureau of Investigation ("FBI") as undercover agents,

infiltrating the American Communist Party and its organizations. After they completed their activities in 1992, the Makuches tried unsuccessfully to obtain compensation from the Government for their valuable service. In or about late 1998, the Makuches contacted Mr. Zaid and asked him to represent them in their efforts to secure compensation. Based on Mr. Zaid's experience in representing clients in claims against the Government, it was ultimately determined that the best chance the Makuches had to secure the compensation they sought was through private legislation to be enacted by the United States Congress. Plaintiffs' Proposed Findings of Undisputed Facts (Pl. PFUF) 1; Declaration of Mark S. Zaid, Esq. (Zaid Decl.) ¶ 3.

On or about June 9, 1998, Mr. Zaid sent the Makuches a written engagement letter outlining the terms of his representation, but leaving blank the percentage that he would receive if he succeeded in getting the Makuches the relief that they sought. Pl. PFUF 2; Exhibit 1 to Zaid Decl. ¶ 3.[1] Although the Makuches never signed that engagement letter, they discussed the terms with Mr. Zaid and agreed to all the terms, save the contingency percentage and the amount of an upfront retainer payment, if any. Mr. Zaid and the Makuches agreed to continue discussing these terms while Mr. Zaid began working their matter. Pl. PFUF 3; Zaid Decl. ¶ 3.

The Makuches ultimately agreed that Mr. Zaid would represent them on a contingency basis whereby he would receive one-third (33 1/3 %) of any money that they

[1] Relevant information pertaining to Mr. Zaid's representation of the Makuches is being revealed pursuant to Rule 1.6(e)(5) of the D.C. Rules of Professional Conduct. The documents submitted in support of Plaintiffs' Proposed Findings of Undisputed Facts are redacted to protect the attorney-client communications that are not relevant to the contingency fee term of the agreement between Mr. Zaid and the Makuches. Those parts of the emails dealing with the contingency fee agreement had previously been disclosed in a lawsuit brought by Mr. Zaid against the Makuches to recover legal fees under that agreement.

received from the Government as compensation for their lengthy service to the FBI. Pl. PFUF 4; Zaid Decl. ¶ 4. Barbara Makuch, serving as the point of contact for her and her husband, confirmed in writing on numerous occasions that Mr. Zaid would receive one-third of any recovery he obtained for both the Makuches. Pl. PFUF 4; Exhibits 2 – 7 to Zaid Decl. ¶ 4 – 10.

Based on the parties' agreement to the terms of the engagement letter, Mr. Zaid worked for over four years to secure compensation for the Makuches for their services, including the private relief bills. After first undertaking media efforts and litigation under the Freedom of Information Act, Mr. Zaid initiated efforts to obtain compensation for the Makuches through private relief legislation. During this time, Mr. Zaid worked with numerous staff members for Members of Congress and representatives of the FBI to secure introduction and passage of the two private relief bills. Pl. PFUF 5; Zaid Decl. ¶ 11. On or about October 27, 2000, Congressman Thomas M. Reynolds introduced two private relief bills – H.R. 5598 and H.R. 5599 – directing the Secretary of the Treasury to pay $1,000,000.00 to each of the Makuches as compensation for the lifetime value of benefits earned but not received from their services with the FBI. Pl. PFUF 6; Zaid Decl. ¶ 12. Both H.R. 5598 and H.R. 5599 were referred to the House Committee on the Judiciary and its Subcommittee on Immigration and Claims. No further action was taken on either bill before the term of the 106th Congress expired. Pl. PFUF 6; Zaid Decl. ¶ 12.

Following the convening of the 107th Congress in January 2001, on or about February 6, 2001, Congressman Reynolds re-introduced the two private bills, which were assigned H.R. 486 and H.R. 487 and referred to the House Committee on the Judiciary. Pl. PFUF 7; Zaid Decl. ¶ 13. During the period February 2001 through September 18,

2002, the two private relief bills for the Makuchs proceeded through the legislative stages in the United States House of Representatives and the United States Senate. Mr. Zaid continued to be engaged in the process, monitoring the progress of the bills for the Makuches. Pl. PFUF 8; Zaid Decl. ¶ 14.

Both bills were passed by the House on May 21, 2002, and by the Senate on September 18, 2002.[2] On or about October 4, 2002, the President signed both bills: H.R. 486, which provided for relief of Barbara Makuch, became Private Law No: 107-3[3], and H.R. 487, which provided for relief of Eugene Makuch, became Private Law No: 107-4.[4] Mr. Zaid had assisted the Makuches in obtaining $2,000,000.00. Pl. PFUF 9, 12; Zaid Decl. ¶¶ 15 – 16. As a result, his contingency arrangement of one-third entitled him to

---

[2] *See* http://www.govtrack.us/congress/bill.xpd?bill=h107-486 and http://www.govtrack.us/congress/bill.xpd?bill=h107-487#votes.

[3] Section 1 provided, "In consideration of the fact that Barbara Makuch-- (1) served 22 years as a foreign counterintelligence agent and dedicated her life to assist the Federal Bureau of Investigation in its efforts at the height of the Cold War to combat communism, the Komitet Gosudarstvennoy Bezopasnosti (KGB), and the Soviet Union, (2) was presented the Louis E. Peters Memorial Service Award, the highest civilian award presented by the Federal Bureau of Investigation, for her valorous service, and (3) has not received employment assistance or health, social security, or pension benefits, despite assurances that she would receive such benefits upon her retirement, the Secretary of the Treasury shall pay, out of funds not otherwise appropriated, the sum of $1,000,000 to Barbara Makuch of East Amherst, New York, in compensation for the lifetime aggregate value of benefits earned but not received by Barbara Makuch. Pl. PFUF 9; Exhibit 8 to Zaid Decl. ¶ 15.

[4] Section 1 provided, "In consideration of the fact that Eugene Makuch -- (1) served as a foreign counterintelligence agent and dedicated his life to assist the Federal Bureau of Investigation in its efforts at the height of the Cold War to combat communism, the Komitet Gosudarstvennoy Bezopasnosti (KGB), and the Soviet Union, and (2) has not received employment assistance or health, social security, or pension benefits, despite assurances that he would receive such benefits upon his retirement, the Secretary of the Treasury shall pay, out of funds not otherwise appropriated, the sum of $1,000,000 to Eugene Makuch of East Amherst, New York, in compensation for the lifetime aggregate value of benefits earned but not received by Eugene Makuch. Pl. PFUF 9; Exhibit 9 to Zaid Decl. ¶ 15.

compensation in the amount of $666,666.00. Pl. PFUF 9; Zaid Decl. ¶ 15.

Section 3 of each bill, however, contained a provision limiting the amount of money that the Makuches could pay to Zaid for his success in getting the private relief bills enacted. This provision titled "Limitation on Attorney Fees" stated, "Not more than 10 percent of the sum paid under section 1 shall be paid to or received by any agent or attorney for services rendered in connection with the recovery of such sum. Any person who violates this section shall be fined under title 18, United States Code." This language was not included at the request of, or with the consent of, either the Makuches or Mr. Zaid. Pl. PFUF 10; Zaid Decl. ¶ 17. Thus, Mr. Zaid was only allowed to recover, and the Makuches were only allowed to pay, the sum of $200,000.00 despite the fact that they had agreed Mr. Zaid would be entitled to one-third of any recovery, or $666,666.00.

During the legislative process, Congress requested that the Department of Justice ("DOJ") review the proposed bills. In its response the DOJ expressed concern that the limitation provision could result in a compensable taking under the Fifth Amendment. In a September 5, 2001 letter from Assistant Attorney General Daniel Bryan to Congressman George Gekas, then Chairman of the Subcommittee on Immigration and Claims, the DOJ advised and cautioned:

> We note that if either or both of the Makuches has a contract with an agent or attorney that entitles the agent or attorney to a fee greater than 10 percent of the award amount, **an attempt by Congress to deprive such an agent or attorney of the full fee might constitute a "taking" of private property for which compensation would be due under the Fifth Amendment**. *See Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224 (1986)(contractual rights may be property that the government cannot take without "just compensation"). "The inquiry into whether a taking has occurred is essentially an 'ad hoc factual inquiry.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984). Because we do not know whether such a contract even exists, we cannot determine whether section 3 of both bills would effect a compensable taking.

> Nonetheless, if these sanctions do result in a taking, the Makuches' agent or attorney would be able to pursue a remedy through the Tucker Act, 28 U.S.C. Section 491. **The courts presume that a Tucker Act remedy is available unless Congress specifically forbids this method of recourse. *See Ruckelshaus*, 467 U.S. at 1018 – 1019. Because the bill does not mention the Tucker Act, we would construe this remedy to remain available.** (Emphasis added).

Pl. PFUF 11; Zaid Decl. ¶ 18. Despite this warning from DOJ, Congress included the provision limiting Mr. Zaid's attorney's fees.[5] Mr. Zaid ultimately received only $100,000.00 from the Makuchs. Pl. PFUF 13; Zaid Decl. ¶ 19. As Congress criminalized the payment or receipt of the $466,666.00, Mr. Zaid was legally entitled to receive under his contractual arrangement with the Makuchs, that money has not been recovered.

## ARGUMENT

### I. LEGAL STANDARDS

#### A. Subject Matter Jurisdiction.

The Tucker Act, 28 U.S.C. § 1491 (2000), confers upon the United States Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id*. § 1491(a)(1). Although the Tucker Act waives the sovereign immunity of the United States for claims for money damages, the statute "itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money

[5] Curiously, notwithstanding its own letter of September 5, 2001, the Government now argues that Mr. Zaid does not have a compensable property interest that can be taken by the Government and that Congress' action did not constitute a Fifth Amendment taking. As detailed herein, the Government is wrong on both accounts.

damages.” *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). The separate source of substantive law must constitute a “money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States.” *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994).

**B. Motion to Dismiss Pursuant to RCFC 12(b)(6).**

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the court “must determine ‘whether the claimant is entitled to offer evidence to support the claims,’ not whether the claimant will ultimately prevail.” *Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007). "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.... '[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' "*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). In other words, the issue is whether the plaintiff is "entitled to offer evidence to support the claims." *Id*.

The United States Supreme Court recently clarified the standard with respect to the degree of specificity with which a plaintiff must plead facts sufficient to survive a Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007). It stated that “a plaintiff’s obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.” *Id.* at 1964-65 (citation & quotation marks omitted). The Supreme Court added

that, while a complaint need not contain "detailed" factual allegations, those "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citation & footnote omitted). Thus, in reviewing an RCFC 12(b)(6) motion, this court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006) (citations & quotation marks omitted).

**C. Summary Judgment**

According to Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"), summary judgment is appropriate "if the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Contract interpretation is a question of law that is generally resolvable by summary judgment. *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002). In order to prevail on a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of evidence to support an essential element of the non-movant's claim. *Riley & Ephriam Constr. Co., Inc. v. United States*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)); *George Hyman Constr. Co. v. United States*, 30 Fed. Cl. 170, 173 (1993), *aff'd* 39 F.3d 1197 (Fed. Cir. 1994). Once the moving party has satisfied its initial burden, the burden shifts to the opposing party to establish a genuine issue of material fact, "that is, evidence such that a reasonable [trier of fact] could return a verdict for the

nonmoving party" with regard to that element of the claim. *Anderson*, 477 U.S. at 248, *quoted in Long Island Sav. Bank v. United States*, 503 F.3d 1234, 1243-44 (Fed. Cir. 2007). In meeting its burden, the non-movant "cannot rest on mere allegations, but must present actual evidence." Id. at 1244. RCFC 56(e) provides,

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*Anderson*, 477 U.S. at 248-49.

## II. MR. ZAID'S CONTINENGY FEE AGREEMENT WITH THE MAKUCHES CONSTITUTES A PROPERTY RIGHT THAT GRANTS THIS COURT JURISDICTION TO ADJUDICATE THE GOVERNMENT'S TAKING WITHOUT PAYMENT OF REASONABLE COMPENSATION.

Under both New York law (the state where the Makuches reside) and District of Columbia law (the jurisdiction where Mr. Zaid maintained his law practice), a valid and enforceable contract simply requires an intention of the parties to be bound and an agreement as to all material terms. *See Simon v. Circle Assocs*., 753 A.2d 1006, 1012 (D.C. 2000). *Tractebel Energy Mktg. v. AEP Power Mktg*., 487 F.3d 89, 95 (2nd Cir. 2007)("To create a binding contract, there must be a manifestation of mutual assent, sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. … However, not all terms of a contract need to be fixed with absolute certainty. A contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement. At some point virtually every agreement can be said to have a degree of indefiniteness, but parties should be held to their promises.") An agreement between an attorney and his client is a valid, enforceable

contract. *See e.g., Bernard v. Las Americas Communs*., 84 F.3d 103, 109 (2nd Cir. 1996)(evaluating the materiality of an attorney's breach of a contract for legal services) and *Continental Casualty Co. v. Cole*, 809 F.2d 891, 897 (D.C. Cir. 1987)("Virtually every attorney-client relationship is contractual in nature.").

Although Mr. Zaid did not have a detailed written retainer agreement with the Makuches, the uncontroverted e-mail record reflects that the parties agreed to the material terms of the representation, including that Mr. Zaid would be entitled to one-third of any compensation obtained by the Makuches pursuant to the passage of private relief legislation. *See* Zaid Decl., Exhibits “A” – “F”. The fact that the Makuches did not sign the engagement letter does not invalidate the contract between them and Mr. Zaid nor does it vitiate Mr. Zaid’s property interest in that enforceable contract. A written, unsigned contact can be enforced where the conduct of the parties indicate an intention to be bound by the terms of the unsigned contract. *Scientific Components Corp. v. ISIS Surface Mounting, Inc.*, 539 F. Supp. 2d 653, 658 (E.D.N.Y. 2008)(finding the existence of an enforceable contract even absent defendant's explicit acceptance of a counter-offer due to defendant's ongoing conduct recognizing the existence of a contract as well as defendant's transmission of a cancellation email seeking to terminate future obligations); *Davis v. Winfield,* 664 A.2d 836, 838 (D.C. 1995)(“When the parties to a contract set forth the terms of their agreement in writing and manifest in some manner a clear intent to be bound, the absence of one party's signature on the written agreement will not defeat or invalidate the contract. The purpose of a signature is simply to demonstrate mutual assent to a contract, but that may be shown instead, or in addition, by the conduct of the parties.”) Ms. Makuch’s subsequent e-mails regarding the one-third contingency fee

demonstrates their acceptance of that term, and the contract is enforceable.

There can be no doubt that Mr. Zaid and the Makuches entered into a valid and enforceable contract that is a compensable property interest protected by the Fifth Amendment in the case of a government taking. *See Lynch v. United States,* 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States."); *United States v. Petty Motor Co.*, 327 U.S. 372, 381 (1946)(holding that plaintiff was entitled to just compensation for government's taking of option to renew a lease); *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n. 16 (1977)("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."). Indeed, one of the main cases the Government relies on in its brief, *Huntleigh USA Corp. v. U.S.*, 525 F.3d 1370, 1377 - 78 (Fed. Cir. 2008), explicitly notes that the underlying contracts between the plaintiff and the airports were valid property interests covered by the Fifth Amendment – "The protections of the Takings Clause apply to real property, personal property, and intangible property. In this case, it is undisputed that the property interests *Huntleigh* alleges were taken are, for purposes of the Fifth Amendment, cognizable property interests. (Citations omitted.)"

The Government's argument that Mr. Zaid does not have a compensable property interest is both confusing and confused. It is confusing because the Government argues that this Court lacks jurisdiction because there was only a possibility that Congress might pass a private relief bill. Government's Motion to Dismiss at p.5 ("Gov't Motion"). Yet it concedes that "there is no question that Congress' action represented a net benefit to Mr.

Zaid. *Id*. at 9. Mr. Zaid either had a property interest in the contract with the Makuches or he did not. The Government's concession that Mr. Zaid benefited by Congress's action reveals that he had a property right under the contract with the Makuches. Obviously Mr. Zaid was entitled to his percentage (33 1/3%) only IF Congress granted relief. Mr. Zaid could not have pursued this lawsuit, for example, had Congress not passed, and the President ultimately signed, the Makuches private relief legislation.[6]

The Government's argument in its brief is confused because it concludes that Congress' discretion to enact a private relief bill means that Mr. Zaid's contract with the Makuches is one that "deals with a subject matter which lies within the control of Congress" and thus has a "congenital infirmity." Gov't Motion at p.5 quoting *Norman v. Baltimore & Ohio R. Co.*, 294 U.S. 240, 307 – 308 (1935). In order for a contract to have a "congenital infirmity," the contact must relate to, or deal with, some subject matter that is clearly within the control of Congress – *e.g.*, railroads (*Norman*, *supra*); interstate commerce (*Boettjer v. Chesapeake & O.R. Co.*, 612 F. Supp. 1207, 1210 (Regional Rail Reorg. Ct. 1985), foreign affairs (*Chang v. United States*, 859 F2d. 893 (Fed. Cir. 1988), or commerce with foreign nations (*Rockefeller Ctr. Props. v. United States*, 32 Fed. Cl. 586, 592 (Fed. Cl. 1995)). Here, the underlying contact at issue in this case is a private agreement between an attorney and his clients that deals with the scope and nature of that

---

[6] But that claim would fail not because Mr. Zaid lacked a property interest under the Tucker Act but because of the failure of a condition precedent in that contract, *i.e.*, that Congress would pass a bill, upon which his right to be paid depended. So the Government's argument that "where the very nature of the contracted-property interest is defined by reference to an exercise of Congress' discretion, there is no property interest until Congress exercises that discretion" is based on the flawed assumption that the discretionary act by Congress creates a property interest. Here, Mr. Zaid has a contractual property interest that was adversely impacted by Congress' discretionary action of enacting a private relief bill that reduced his percentage from 33 1/3% to 10%.

representation.

The fact that Congress has total discretion whether to enact a private relief bill does not mean that this contract automatically catches the "congenital infirmity" that infected and doomed the underlying contracts at issue in *Norman* and *Chang*. Otherwise Congressional discretion would swallow the Takings Clause. Mr. Zaid does not challenge the authority of the Congress to enact private relief legislation as it sees fit. Nor does he challenge the Government's right to take private property for a public interest. But he does challenge the Government's argument that it need not pay just and reasonable compensation when Congress enacts private relief legislation that deprives him, and him alone, of his lawfully-entitled to property rights.

The Court of Appeals for the Federal Circuit rejected a similar argument advanced by the Government in *Cienega Gardens v. U.S.*, 331 F.3d 1319 (Fed. Cir. 2003). There the plaintiff owners of real estate developments had taken out mortgages from private lenders for construction of housing projects as part of a Department of Housing and Urban Development ("HUD") program to provide affordable housing to low income families. HUD provided mortgage insurance to the owners that enabled them to obtain the low-interest, forty year loans from the private lenders. The owners entered into a Regulatory Agreement with HUD that placed a variety of restrictions on the owners (income levels of tenants, allowable rental rates, *etc*.) and referenced several HUD regulations. The Regulatory Agreement was in effect only as long as the HUD contract for mortgage insurance was in effect. One of the regulations included recognition of the owners' rights to prepay the forty-year mortgages after twenty years. HUD reviewed the mortgage documents that had been drafted to conform to existing

HUD regulations, and the mortgage trust notes provided that the owners could not prepay their mortgages (without HUD approval) during the first twenty years of the mortgage, but could do so "without such approval" after twenty years. *Id.* at 1325.

As the twenty-year payment eligibility date approached, Congress realized that the owners' prepayment of the mortgages – and subsequent removal of those properties from the HUD assisted low-income family housing pool – would hamper HUD's efforts to provide low-cost housing. In response, Congress suspended the prepayment provisions through the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA "), then eliminated the prepayment provisions through the Low-Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"), both of which requiring HUD approval for prepayment of the mortgages. In 1996, Congress lifted the restrictions requiring HUD approval to prepay the mortgages. The owners sued the government for the regulatory impact of the legislation that eliminated the prepayment provision for an eight year period.

The Government argued that the owners did not have a compensable property interest because the contracts at issue were subject to government regulation. The court soundly rejected the Government's reasoning, and its reasoning is quite applicable to this case:

> On the question whether the Owners had vested property interests, the government's position is that "enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control, such as the Section 221(d)(3) and 236 insured housing programs." Because the prepayment right at issue in this case was created by the Owners' private contracts with private lenders, the position urged by the government means that all such contract rights are purely illusory if they concern activity "subject to pervasive Government control." To understand what is wrong with this argument it is necessary

> to understand the true scope of the effect implied by this viewpoint. The government, essentially, asks us to hold that nothing in the Owners' private mortgage agreements has any force and effect. The government, thus, advocates a legal regime that eviscerates century-old understandings of the stable and enduring nature of contract and real property rights. We take particular issue with the government's position that the Owners had no property interest because "[t]he prepayment provision contained in the Owners' deed-of-trust notes did not exist independently of, but rather was subject to, limited by, and totally dependent upon, [the] regulatory regime, including the power of the Government to change the prepayment rules expressly set forth in regulations reserving to HUD that authority" (emphasis in the original). This interpretation of the implications of a regulatory program on the existence of property interests is unwarranted. The government can point to nothing in either the mortgage contracts or the Regulatory Agreements that supports the position that contract and real property rights were premature, suspended or diluted almost to the point of meaninglessness. Instead, the government boldly asserts that this court should read into private contracts limitations that are not even hinted at in their text. The government's position is unconvincing. The government's contention is, in effect, that Congress could retroactively alter the Owners' mortgage contracts in any way it chose without any recourse for the Owners. That cannot be, and is not, the law.

*Cienega Gardens* 331 F3d. at 1330 – 1331.

Mr. Zaid's complaint alleges sufficient facts, and offers evidence, demonstrating that he has a cognizable property interest that is covered by the Fifth Amendment. The lawful contractual agreement between Mr. Zaid and his clients as to how he will be compensated is not one that deals with a subject matter within the control of Congress. Congress can choose whether or not to enact a private relief bill, but that discretion does not give Congress the power to unilaterally interfere and take Mr. Zaid's property interest in that contract by reducing his contingency fee recovery absent just compensation.

## III. CONGRESS' REDUCTION OF MR. ZAID'S CONTINGENCY FEE CONSTITUTED A CONSTITUTIONAL TAKING FOR WHICH HE IS ENTITLED TO REASONABLE COMPENSATION

### A. The Private Relief Bills Enacted By Congress Were Directed at Modifying Mr. Zaid's Legal Contract With the Makuches

The private relief bills were unequivocal as to whether more than 10% of the money given to the Makuches could be used to satisfy their contractual obligations to Mr. Zaid for his successful representation of them before Congress. Congress made it an explicit crime for the Makuches to pay, or for Mr. Zaid to accept, more than $200,000.00 for his legal services. Where, as here, Congress' action is directed at a valid contract, the courts have found that such an action constitutes a taking under the Fifth Amendment that requires compensation.

In *Cienega Gardens*, *supra*, the Federal Circuit determined that the owners' contracts with private lenders were cognizable property rights under the Fifth Amendment and that Congress' action was a taking of those property rights. In reaching its holding, the court determined that the Congress' acts directly impacted the owners' property interest – as opposed to frustrating or incidentally impacting contract rights (*see Omnia Commercial Co. v. United States*, 261 U.S. 502, 511 (1923) – as the legislation was aimed at a specific provision in the owners' private contracts that abrogated their rights. The Court ruled:

> The proposition in *Omnia* about consequential loss or injury refers to legislation targeted at some public benefit, which incidentally affects contract rights, not, as in this case, legislation aimed at the contract rights themselves in order to nullify them. See *Cienega III*, 38 Fed. Cl. at 74 (explaining that the purpose of ELIHPA and LIHPRHA was to extend the duration of the Owners' duty to provide low-income housing under the Regulatory Agreements and citing ELIHPA). The Supreme Court explained in *Winstar* that "governmental action will not be held against the Government for purposes of the impossibility defense so long as the

> action's impact upon public contracts is ... merely incidental to the accomplishment of a broader governmental objective.” 518 U.S. at 898, 116 S.Ct. 2432 (citation omitted, emphasis added). “The greater the Government's self-interest, however, the more suspect becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence, and where a substantial part of the impact of the Government's action rendering performance impossible falls on its own contractual obligations, the defense will be unavailable.” *Id*.; see *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 768, 572 F.2d 786 (1978) (rejecting sovereign acts defense where the Secretary of the Interior's actions were “directed principally and primarily at plaintiffs' contractual right”). **The enactment of ELIHPA and LIHPRHA directly and intentionally abrogated the contracts. The effect on the contracts is, therefore, not merely consequential**. Where Congress' actions have the effect of “keep[ing] [the contract] alive for the use of the government” rather than “bring[ing] the contract to an end,” a court should conclude that there has been a taking.

*Cienega Gardens*, 331 F.3d at 1334 -1335 (emphasis added).

Here, just as in *Cienega Gardens*, the legislation enacted by Congress directly and intentionally took a significant portion of the compensation that Mr. Zaid was entitled to receive for his representation of the Makuches. Under the expressed reasoning in *Cienega Gardens*, Mr. Zaid’s contract rights were taken by the Government as a result of the payment restriction contained in the private relief bills. Congress took Mr. Zaid’s contract rights and used those funds to further the Government’s interest in increasing the amount of money the Makuches would keep. This the Government cannot do without providing compensation to Mr. Zaid for his loss.

Given the holding in *Cienega Gardens*, the Government’s reliance on *Huntleigh USA Corp. v. United States*, *supra*, and the doctrine of frustration of contract is misplaced. Indeed, the Court in *Huntleigh* recognized the distinction between directed government action versus government action that indirectly impacts a contract. “In this case,” the *Huntleigh* Court wrote, “the purpose of ATSA was not to take action with

respect to any screening contract to which Huntleigh was a party. Rather, its purpose was to transfer security screening responsibilities from the airlines to the federal government. This action, directed at the airlines, frustrated Huntleigh's business interests." *Huntleigh*, 525 F.3d at 1381. In *Palmyra Pac. Seafoods, L.L.C. v. United States*, 80 Fed. Cl. 228, (Fed. Cl. 2008), this court recently recognized the importance of the distinction between action directed at a private contract versus action that frustrates the performance of private contract. In that case, the court noted, "The legislation involved in *Cienega Gardens* was 'aimed at the contract rights themselves in order to nullify them,' not only in motivation but in structure and form ... The statute in *Cienega Gardens* directly acted upon and abrogated the contract rights themselves, but the same characterization cannot be ascribed to the government actions in *Omnia* and in this case, which regulated only the subject matter of the respective contracts - the steel production and commercial fishing activities." *Id*. at 235.

Congress' insertion of the 10% payment restriction in the private relief legislation did not frustrate the Makuches' ability to perform nor did it make it impossible for them to perform. The money was available and it could have been paid to Mr. Zaid. But Congress made it illegal for them to pay Mr. Zaid. And, had the Makuchs desired to risk criminal penalty because of their belief Mr. Zaid was entitled to and deserved the agreed upon compensation it was illegal for Mr. Zaid to accept the payment. Had he done so he would have faced severe fines and potentially incarceration!

**B. The Ten Percent Payment Limitation Provision Imposed Upon Mr. Zaid The Entire Burden Of The Government's Desire To Maximize The Amount Received By The Makuches Thereby Entitling Him Under The Fifth Amendment To Receive Appropriate Compensation**

"The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar the Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). The Supreme Court has also recognized that it "has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, (1978). Instead, it has "observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely "upon the particular circumstances [in that] case." *Id.*

In cases where the Government exercises its eminent domain power to take property, or where the interference with property is like a physical invasion by the government, *see, e. g., United States v. Causby,* 328 U.S. 256 (1946), the courts have readily found that there has been a taking of property requiring compensation. Here, as in an eminent domain taking, the impact of the 10% payment limitation provision is that Congress took money owed to Mr. Zaid under a legally valid and binding contract and gave it to the Makuches. Because of the payment limitation provision, the Makuches' retained $466,666.00 more of the private relief money than they otherwise would have received absent that provision. Although it is within the authority of Congress to have

determined that as a matter of policy a public purpose was served by enabling the Makuches to keep as much of the funds as possible, it cannot simply take that money from Mr. Zaid and require him to shoulder that burden alone without reasonably compensating him.

By analogy, the Government could not take two-thirds of a parcel of land owned by Mr. Zaid and give it to the Makuches to build a house and establish a farm without compensating Mr. Zaid. Neither can Congress take money from Mr. Zaid and make it a criminal offense for the Makuches to pay (and for Mr. Zaid to receive) $466,666.00 owed under a valid contract in order for the Makuches to have more money without compensating Mr. Zaid for that loss of money. The Government has forced Mr. Zaid – and Mr. Zaid alone – to bear the burden of the $466,666.00 the Government wanted the Makuches to keep. If Congress wanted the Makuches not to pay more than ten percent of the private relief funds in the form of attorney's fees, it should have appropriated additional funds to cover the cost of Mr. Zaid's legal services so that the burden was shared by all taxpayers.

The Government also argues that Mr. Zaid cannot recover as he fails to allege a compensable taking under the framework established by the Supreme Court in *Penn Central*, *supra*, for evaluating when government regulation goes "too far" so as to effect a taking of property. But Congress' action in this case is not a regulation effecting property; instead, it was a straightforward taking of $466,666.00 from Mr. Zaid. The analysis under the *Penn Central* factors is simply not applicable to the facts of this case. Nonetheless, should this Court construe Congress' action as a "regulation" of Mr. Zaid's

contractual property interest, the regulation went "too far," and the Government must compensate Mr. Zaid for his loss.

Under *Penn Central*, courts use a three-factor analysis to assess claimed regulatory takings: (1) character of the governmental action, (2) economic impact of the regulation on the claimant, and (3) extent to which the regulation interfered with distinct investment-backed expectations. *Loveladies Harbor v. United States*, 28 F.3d 1171, 1176-77 (Fed.Cir.1994). "The first criterion require[s] that a reviewing court consider the purpose and importance of the public interest reflected in the regulatory imposition. In effect, a court [must] balance the liberty interest of the private property owner against the Government's need to protect the public interest through imposition of the restraint." *Loveladies* at 1176. Here, Congress' actions effected a taking of Mr. Zaid's property interest in a specific contingency fee compensation plan established by a legally binding contract with the Makuches. Although Congress can act for a public purpose to guarantee that the Makuches retain as much of the public relief money as it sees fit, Congress cannot make Mr. Zaid disproportionately bear that burden by taking $466,666.00 of his fee. As the Court explained when reviewing the disparate impact of the low income housing statutes on the owners of the affected properties:

> Unquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners. Congress' objective in passing ELIHPA and LIHPRHA-preserving low-income housing-and method-forcing some owners to keep accepting below-market rents is the kind of expense-shifting to a few persons that amounts to a taking. This is especially clear where, as here, the alternative was for all taxpayers to shoulder the burden. Congress could simply have appropriated more money for mortgage insurance and thereby induced more developers to build low-rent apartments in the public housing program to replace housing, such as the plaintiffs', that was no longer part of the program.

*Cienega Gardens,* 331 F3d. at 1339 – 39. The Government's argument in this case that Congress' action did not result in a "public use" because there was no exercise of eminent domain is plainly wrong. First, the cases cited by the Government involve the seizure of property pursuant to the exercise of police powers for law enforcement. That is not analogous to the circumstances here. Second, the "public use" in this case is the use of Mr. Zaid's money to increase the amount of money that the Makuches kept out of the private relief funds – funds that were awarded to them for service to the United States.[7] The Government also contends that the Court must consider the fact that there was a benefit to Mr. Zaid as result of the enactment of the private relief bills. That is true, but it misses the point. Simply because there was some benefit to Mr. Zaid does not mean that the Government can require him alone to bear the burden of the taking. Instead, as noted by the Court in *Cienega Garden,* Congress could have appropriated additional money to pay the contingency fee to which Mr. Zaid was entitled to recover from the Makuches for his effective representation so that the Makuches would receive the amount of money that Congress deemed appropriate and Mr. Zaid would have received the contingency fee as set forth in his contract with the Makuches.

"The second criterion, economic impact of the regulation on the claimant, was intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim. Government hardly could go on if to some extent values incident to property could not be diminished

[7] The Government acknowledges that the Makuches kept additional money due to the payment restriction provision – "Neither the Government nor the public benefitted [sic] from the payment limitation provision; instead, the Makuches were permitted to retain a larger portion of the relief Congress gave them as a result of the limitation on Zaid's fee." Gov't Memo at p.8.

without paying for every such change in the general law. Reflecting in part the presumed facts in the cases, what emerged was a threshold requirement that the plaintiff show a serious financial loss from the regulatory imposition." *Loveladies* 28 F.3d at 1176 -1177 (internal quotations and citations omitted). The payment restriction deprived Mr. Zaid of $466,666.00 of the contingency fee that the Makuches had explicitly agreed to pay him for his representation if he succeeded in assisting their efforts to have Congress enact private relief legislation. Clearly, by losing $466,666.00, Mr. Zaid has demonstrated the existence of a "serious financial loss" from Congress' actions.

The Government additionally argues that Mr. Zaid cannot show a negative economic impact because "it was impossible to know that value of his contractual right prior to the enactment of the bills." Again, the Government completely misses the point. Mr. Zaid would have received $0 if Congress had not enacted the private relief legislation. But once the bills became laws and the Makuches were awarded $2 million dollars, Mr. Zaid's contingency fee was automatically fixed at $666,666.00, one-third of the Makuches' recovery as specified in the legally binding contract between Mr. Zaid and the Makuches. This is Black letter contract law and is the most basic and fundamental representational arrangement upon which the attorney-client relationship is based. The impact of the payment limitation provision is not a $200,000 payment to Mr. Zaid but a loss of $466,666.00 that he would have otherwise collected absent the payment limitation provision.

The Government is being disingenuous when it argues that "[p]rior to the enactment of the bills, Zaid was not entitled to payment pursuant to his agreement with the Makuches; after the enactment of the bills, he was entitled to a payment of $200,000

pursuant to that agreement." Although the dollar amount of Mr. Zaid's compensation arrangement would not be determined until such time the private relief bills were enacted and the Makuches were paid, it is clear that once this took place Mr. Zaid was entitled to 33 1/3% of the total amount awarded to the Makuches. The payment limitation provision, however, reduced Mr. Zaid's percentage from 33 1/3% to 10%. It was Congress' actions that forcibly interfered with and **limited** Mr. Zaid's compensation to $200,000, i.e., literally re-wrote the terms of his contractual arrangement. Under the existing contract Mr. Zaid was legally **entitled** to payment of $666,666.00. Congress cannot simply re-write Mr. Zaid's contract with the Makuches to suit the Government's interests without compensating him.

"The third criterion, interference with distinct investment-backed expectations, was a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies*, 28 F.3d at 1177. Of the three *Penn Central* factors, this one best shows why the Government's action was not a "regulatory" taking. First, Mr. Zaid did not "buy" his contingency agreement with the Makuches. At the time of the contingency agreement with the Makuches, there was no "regulatory scheme" in place covering private relief bills or attorney-client agreements. Mr. Zaid could not have anticipated that Congress would attempt to limit his contingency fee when it drafted the private relief legislation. Unlike the plaintiffs in *Chang v. U.S.*, 859 F.2d 893 (1988), Mr. Zaid's claim is not based on an expectation of the continued performance of a contract in a foreign country; his claim is based on a private contract between his law firm and his clients that was executed and performed in the United States. As discussed above, this

contract does not concern, or deal with, an area or subject matter, that is regulated by Congress.

Congress took Mr. Zaid's property. The taking was far from *de minimus*. Under any analytical framework for determining whether the Government's action constitutes a constitutional taking, Congress' action in this case was a taking that requires compensation to Mr. Zaid.

**CONCLUSION**

For the reasons stated above, Zaid respectfully requests that the Court enter an order denying the Government's Motion to Dismiss, granting his Motion for Summary Judgment and awarding him $466,666.00 plus pre-judgment interest at the rate of six percent from October 4, 2002, the date the private relief bills were signed into law.[8]

Dated: July 21, 2008

s/ Eric H. Imperial

Eric H. Imperial (D.C. Bar #427139)
815 Connecticut Avenue, N.W.; Ste. 220
Washington, DC 20006
(202) 457-1280
(202) 595-1986 (fax)
eric@imperiallaw.com

[8] *Jacobs v. U.S.*, 290 U.S. 13 (1933). Simple interest is calculated: Interest = principal x rate x time. For example, at a rate of 6% per annum, the total interest due on the $466,666.00 as of October 4, 2008 would be $167,999.75.

UNITED STATES COURT FOR FEDERAL CLAIMS

| | | |
|---|---|---|
| MARK S. ZAID, P.C. *et al*. | * | |
| | * | |
| Plaintiffs | * | No. 08-20 C |
| | * | Judge Thomas C. Wheeler |
| v. | * | |
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | |
| Defendant | * | |
| | * | |

*  *  *  *  *  *  *  *  *  *  *  *  *

**ORDER**

Upon consideration of Defendant's Motion to Dismiss and Plaintiffs' Cross-Motion for Summary Judgment, and the entire record herein, it is this ______ day of __________________ 2008, hereby

ORDERED, that defendant's Motion is denied; and further

ORDERED, that summary judgment is entered on behalf of the plaintiff; and further

ORDERED, that plaintiff is entitled to the sum of $466,666.00 plus applicable pre-judgment interest.

________________________________________

Judge Thomas C. Wheeler